**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RAY FIGURELLA, Derivatively on Behalf of SPRINKLR, INC., <br><br> Plaintiff, <br><br> v. <br><br> RAGY THOMAS, MANISH SARIN, NEERAJ AGRAWAL, EDWIN GILLIS, KEVIN HAVERTY, YVETTE KANOUFF, EILEEN SCHLOSS, TARIM WASIM and TRAC PHAM, <br><br> Defendants, <br><br> -and- <br><br> SPRINKLR, INC., <br><br> Nominal Defendant. | Case No. <br><br><br><br> **DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Ray Figurella ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Sprinklr, Inc. ("Sprinklr" or the "Company"), brings this Verified Shareholder Derivative Complaint against Defendants Ragy Thomas ("Thomas"), Manish Sarin ("Sarin"), Neeraj Agrawal ("Agrawal"), Edwin Gillis ("Gillis"), Kevin Haverty ("Haverty"), Yvette Kanouff ("Kanouff"), Eileen Schloss ("Schloss"), Tarim Wasim ("Wasim"), and Trac Pham ("Pham") (collectively, the "Individual Defendants" and together with Sprinklr, "Defendants"), for and among other things, breaching their fiduciary duties to Sprinklr stockholders and violations of the federal securities laws.

Plaintiff alleges the following based upon personal knowledge with respect to Plaintiff and,

1

as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of the Company's filings with the United States Securities and Exchange Commission ("SEC"), news articles, press releases, conference call transcripts, analysts' reports, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought against certain current and former Company officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants from March 29, 2023 through June 5, 2024, both dates inclusive (the "Relevant Period"), and which caused substantial damage to the Company and its shareholders.

2.      Sprinklr is an enterprise software company that provides software by subscription. Sprinklr offers two main lines of business: (i) Core Suite enables companies to, among other things, manage and analyze social media content, create personalized customer interactions, optimize digital marketing campaigns, and analyze data for marketing purposes; and (ii) a contact center as a service ("CCaaS") offering that provides the capabilities required to route inbound customer interactions to contact center agents.

3.      After its founding in 2009, Sprinklr gained ground as a market leader through its Core Suite business, which offered many add-on features and bespoke solutions for companies. However, due to the bespoke nature of the Core Suite business, it was more expensive than its competitors. Thus, to sustain its position as a market leader, Sprinklr devoted significant resources to achieve consistent sales and renewals with its customers.

4.      Another drawback to the Core Suite business was that it was a high-priced, mature, low growth product that relied on renewals of existing subscriptions. Consequently, it offered only

limited growth prospects. To achieve desired growth, Sprinklr decided to pivot its business to a new line of business – a CCaaS offering, Sprinklr Service. Importantly for Sprinklr, CCaaS allowed for significantly more growth through service contracts and the use of Artificial Intelligence. Therefore, at the end of 2022 – after taking the year to build up its CCaaS offering – the Company prepared to make a meaningful shift towards entering the CCaaS marketplace.

5.      However, the Individual Defendants failed to disclose serious, known risks regarding their entry into the CCaaS marketplace, including the Company's lack of sales contacts or sales staff experienced in CCaaS. More significantly, and unbeknownst to investors, the Company diverted significant resource from its Core Suite business to Sprinklr Service, endangering the primary driver of Sprinklr's revenue and damaging prospects for needed renewal business.

6.      Despite these known risks, throughout the Relevant Period, the Individual Defendants continued to misleadingly assure investors that Sprinklr's Core Suite business and its Sprinklr Service CCaaS business were performing strongly and had bright futures, without ever disclosing the known risks to both as a result of the Company's secret diversion of resources and manpower away from its Core Suite and towards Sprinklr Service CCaaS business.

7.      The truth began to emerge on December 6, 2023, when the Company revealed that at the beginning of 2023, Sprinklr had diverted needed resources and manpower from Core Suite to Sprinklr Service, and this damaged sales and renewals of Core Suite products.

8.      On this news, Sprinklr's stock price declined 34% from a closing price of $16.70 on December 6, 2023 to a closing price of $11.11 per share on December 7, 2023.

9.      Following this disclosure, the Individual Defendants continued to downplay the real impact that diverting resources from Core Suite to Sprinklr Service was having on the

3

Company's sales and growth.

10. Then, on June 5, 2024, the Company disclosed that the impact of its failed strategy to focus on Sprinklr Service over Core Suite was significantly larger than it had previously disclosed and would persist. As a result, Defendants withdrew their previous projection of $1 billion in subscription revenue for Fiscal Year 2027.

11. On this news, Sprinklr's stock price declined by over 23%, from a closing price of $10.84 on June 5, 2024 to a closing price of $9.20 per share on June 6, 2024.

12. In light of the Individual Defendants' misconduct, the Company, Defendant Thomas, and Defendant Sarin were named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York under the caption: *In re Sprinklr, Inc. Securities Litigation*, Case No. 1:24-cv-06132-LGS (S.D.N.Y.) (the "Securities Class Action.") The Securities Class Action has further subjected Sprinklr to the need to undertake internal investigations and the need to implement adequate internal controls, as well as exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b), 14(a), and 21D of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78n(a), and § 78u-4(f)) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9).

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Nominal Defendant Sprinklr is headquartered in this District and conducts substantial business in this District. Further, a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District. Additionally, Sprinklr's common stock trades on the New York Stock Exchange, which is headquartered in New York.

## PARTIES

18. Plaintiff is a current shareholder of Sprinklr and has continuously held Sprinklr shares at all relevant times.

19. Nominal Defendant Sprinklr is incorporated under the laws of Delaware and maintains its principal executive offices at 441 Ninth Avenue, 12th Floor, New York, New York 10001. Sprinklr's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CXM."

20. Defendant Thomas served as the Company's Chief Executive Officer ("CEO") from September 2009 until November 2024 and has served as Chairman of the Board since September 2009. Defendant Thomas currently serves as Advisor to the CEO. According to the proxy statement filed on Schedule 14A with the SEC on May 3, 2024 (the "2024 Proxy Statement"), for the fiscal year ended January 31, 2024, Defendant Thomas received $12,414,624 in total compensation from the Company. Pursuant to a role change letter, dated November 4, 2024, as Advisor to the CEO, Defendant Thomas will continue to receive an annual base salary of

$500,000 and an annual discretionary bonus with a target amount equal to 100% of his annual base salary. Defendant Thomas was named as a defendant in the Securities Class Action.

21. Defendant Sarin has served as the Company's Chief Financial Officer ("CFO") since January 2022. According to the 2024 Proxy Statement, for the fiscal year ended January 31, 2024, Defendant Sarin received $4,771,317 in total compensation from the Company. Defendant Sarin was named as a defendant in the Securities Class Action.

22. Defendant Agrawal has served as a Company director since August 2011. Defendant Agrawal also serves as a member of the Board's Audit Committee and its Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, for the fiscal year ended January 31, 2024, Defendant Agrawal received $253,015 in total compensation from the Company.

23. Defendant Gillis has served as a Company director since November 2015. Defendant Gillis with depart the Board on June 12, 2025. Defendant Gillis also serves as the Chair of the Board's Audit Committee. According to the 2024 Proxy Statement, for the fiscal year ended January 31, 2024, Defendant Gillis received $259,986 in total compensation from the Company.

24. Defendant Haverty has served as a Company director since December 2022. Defendant Haverty also serves as a member of the Board's Compensation Committee. According to the 2024 Proxy Statement, for the fiscal year ended January 31, 2024, Defendant Haverty received $177,733 in total compensation from the Company.

25. Defendant Kanouff has served as a Company director since August 2018. Defendant Kanouff also serves as a member of the Board's Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, for the fiscal year ended January 31, 2024, Defendant Kanouff received $222,486 in total compensation from the Company.

26.     Defendant Schloss has served as a Company director since January 2022. Defendant Schloss also serves as a member of the Board's Compensation Committee and as Chair of its Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, for the fiscal year ended January 31, 2024, Defendant Schloss received $409,121 in total compensation from the Company.

27.     Defendant Wasim has served as a Company director since October 2020. Defendant Wasim also serves as a member of the Board's Audit Committee and as Chair of its Compensation Committee.

28.     Defendant Pham served as the Company's Co-CEO from June 2024 until November 2024 and as a member of the Board from June 2023 until November 2024. According to the 2024 Proxy Statement, for the fiscal year ended January 31, 2024, Defendant Pham received $249,986 in total compensation from the Company.

29.     Non-Party Rory Read ("Read") has served as the Company's President and CEO, and as a Company director, since November 2024. Pursuant to the employment agreement between Read and the Company, Read receives an annual base salary of $675,000 and is eligible for an annual bonus equal to 100% of his annual base salary. Read is named herein solely for the purposes of demand futility.

30.     Non-Party Jan Hauser ("Hauser") has served as a Company director since January 2025. Hauser serves as a member of the Board's Audit Committee. Hauser is named herein solely for the purposes of demand futility.

31.     Non-Party Stephen Ward, Jr. ("Ward") has served as a Company director since January 2025. Ward serves as a member of the Board's Compensation Committee. Ward is named herein solely for the purposes of demand futility.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     By reason of their positions as officers and directors of Sprinklr, and because of their ability to control the business and corporate affairs of Sprinklr, the Individual Defendants owed Sprinklr and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Sprinklr in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Sprinklr and its shareholders so as to benefit all shareholders equally.

33.     Each director and officer of the Company owes to Sprinklr and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as officer and directors of Sprinklr, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     To discharge their duties, the officers and directors of Sprinklr were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

36.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Sprinklr, the absence of good faith on their part, or a

8

reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

37. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the New York Stock Exchange, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's supply chain issues resulting from regulations in the travel retail industry. The Individual Defendants also had a fiduciary duty to disclose the material information necessary to prevent other public statements, including those in its regulatory filings with the SEC, from being materially false, so that the market price of the Company's common stock was based upon truthful, accurate, and fairly presented information.

38. To discharge their duties, the officers and directors of Sprinklr were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Sprinklr were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Sprinklr's own Code of Conduct and Ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

9

(c)     remain informed as to how Sprinklr conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Sprinklr and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Sprinklr's operations would comply with all applicable laws and Sprinklr's public statements, financial statements and regulatory filings were accurate;

(f)     adequately monitor the Company's officers and employees to ensure their public statements about the Company were complete and accurate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

39.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Sprinklr.

40.    Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## THE CODE OF CONDUCT AND ETHICS

41.    Sprinklr maintains a Code of Conduct and Ethics (the "Code"), which states that "[e]very employee, officer, director, and third party acting for or on behalf of Sprinklr, such as partners, contractors, agents, and/or other third-party agents, must read, understand, and follow this Code"

42.    In a section titled "Compliance with Laws," the Code states as follows, in relevant part:

> Our success depends upon each employee, officer, and director operating within legal guidelines and cooperating with local, national, and international authorities. Certain laws, such as those pertaining to security and data privacy, are core to our business. These laws apply to various types of information, including personal information, financial information, and other sensitive information. Depending on your role, there are other laws that may relate to your work at Sprinklr, such as laws prohibiting corruption, unfair competition, and rules and regulations governing trade controls, exports, and imports.

> While we do not expect all Sprinklrites to memorize every detail of these laws, everyone is expected to be familiar with the legal and regulatory obligations that are relevant and applicable to your business units and areas of responsibility, which are outlined in this Code and in Sprinklr's Governance.

43.    In a section titled "Honest and Ethical Conduct," the Code provides the following, in relevant part:

> Sprinklr's reputation depends on the honesty, fairness, and integrity brought to the job by each Sprinklrite, and the highest standards of personal integrity, sound judgment, and accountability are the foundation of this Code, Sprinklr Governance, and the Sprinklr Way. Acting with honesty, fairness, and integrity is also paramount to earning and maintaining the trust of our customers. Becoming the world's most loved enterprise software company requires that we maintain the integrity of our business operations, the safety and security of the data that we are entrusted to process, and the relationships that we have built with our customers and partners.

***

Maintenance of Corporate Records, Financial Integrity, and Public Reporting

Sprinklr's corporate and business records should be completed accurately and honestly. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, partners, suppliers, creditors, employees, and others with whom we do business. As a result, it is essential that Sprinklr's books, records, and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs, and expenses, as well as all transactions and changes in assets and liabilities. The integrity of Sprinklr's records and public disclosure depends upon the validity, accuracy, and completeness of the information supporting the entries to our books of account. Making false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. We further require that:

- No entry is made in our books and records that intentionally hides or disguises the    nature of any transaction or of any of our liabilities, or that misclassifies any transaction    as to accounts or accounting periods;
- Transactions are supported by appropriate documentation;
- The terms of sales and other commercial transactions are reflected accurately in the documentation for those transactions, and all such documentation be reflected    accurately in our books and records;
- You comply with all Sprinklr systems of internal controls; and
- No cash or other asset is maintained for any purpose in any unrecorded or "off-the-books" fund.

Sprinklr's accounting records are also relied upon to produce reports for our management, stockholders, and creditors, as well as for governmental agencies. Sprinklr relies upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the Securities and Exchange Commission (the "SEC"), and securities laws require that these reports provide full, fair, accurate, timely, and understandable disclosures that fairly present our financial condition and results of operations. Employees who collect, provide, or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that Sprinklr's financial disclosures are accurate and transparent and that our reports contain the information about Sprinklr that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- No employee may take or authorize any action that would intentionally cause      Sprinklr's financial records or financial disclosures to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC, or other applicable laws, rules, and regulations.
- You must cooperate fully and promptly with Sprinklr's Legal, Finance, and Internal Audit activities, as well as our independent public accountants. You must respond to their questions with candor and provide them with

12

complete and accurate information.

- You must help ensure that Sprinklr's books and records, as well as our reports filed with the SEC, are accurate and complete. No employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosures in any of our reports accurate in all material respects. Obligations around the integrity and accuracy of Sprinklr's books and records also extend to accurate sales forecasting, as well as the need for all Sprinklrites to maintain accurate and up-to-date information in any of Sprinklr's information systems, tools, and systems of record that they manage and engage with.

## THE AUDIT COMMITTEE CHARTER

44.    Sprinklr also maintains a Charter of the Audit Committee of the Board of Directors

(the "Charter"), which states that the purpose of the Audit Committee is to:

assist the Board in fulfilling its oversight responsibilities with respect to:

- the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;

- the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");

- the performance of the Company's internal audit function; and

- the Company's compliance with legal and regulatory compliance, including risk assessment and compliance with ethical standards adopted by the Company.

45.    In a section titled "Responsibilities," the Code lists the following responsibilities of the Audit Committee, in relevant part:

*Financial Review and Disclosure*

7. Annual Audit Results. The Committee will review with management and the Auditors the results of the Company's annual financial statement audit, including:

- the Auditors' assessment of the quality of the Company's accounting principles and practices;

13

- the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative GAAP methods on the financial statements);

- all misstatements identified during the audit (other than those the Auditors believe to be trivial);

- the adequacy of the disclosures in the financial statements; and

- any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

8. Audited Financial Statement Review; Quarterly and Annual Reports. The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

9. Earnings Announcements. The Committee will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information). To the extent practicable, the Committee will review in advance the script for any earnings or finance-related conference calls to be held for the benefit of the public, analysts and ratings agencies.

10. Accounting Principles and Policies. The Committee will review and discuss with management and the Auditors significant issues regarding accounting principles and financial-statement presentation, including:

- critical accounting policies and practices;
- alternative accounting policies available under GAAP;
- the potential impact on the Company's financial statements of alternative treatments and any off-balance sheet structures; and
- any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies.

The Committee will review with the Auditors and management, if appropriate, any written communication, such as any management letter or internal-control letter,

and monitor management's response to such communications.

*** 

*Internal Control and Procedures*

15. Risk Assessment and Management. The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security, competition and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks. The Committee will review and discuss with management the adequacy of the Company's insurance programs, including director and officer insurance, product liability insurance and general liability insurance.

16. Information Security and Data Privacy. The Committee will review the significant information security matters and concerns involving the Company, including cybersecurity, data privacy and related regulatory matters and legal compliance. The Company's Chief Information Security Officer , who has the primary responsibility for our cybersecurity risk assessment and management processes, will provide regular periodic reports to the Committee on information security matters, including the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and will notify the chairperson of the Committee as soon as practicable of significant information security matters and concerns as they arise. Management will also provide regular periodic reports to the Committee on legal compliance matters, including data privacy compliance.

17. Internal Auditors. The Committee will review the audit plan of the Company's internal audit team and discuss with that team the adequacy and effectiveness of the Company's scope, staffing, and general audit approach. The Committee will review any significant reports prepared by the Company's internal auditors, as well as management's response. The head of the internal auditor will also report to and be evaluated by the Committee.

18. Internal Control over Financial Reporting; Disclosure Controls. The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting, including responsibilities, budget and staff of the internal audit function, and to review the

15

appointment or replacement of the senior internal audit executive or manager, and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

19. Correspondence with Regulators. The Committee will consider and review with management, the Auditors, and outside advisors or accountants any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

20. Internal Control Report. At least annually (if required by applicable stock exchange listing requirements) or as may otherwise be determined by the Committee, the Committee will review a report by the Auditors describing its internal quality-control procedures and any material issues raised by (a) that firm's internal quality-control review, (b) any peer review of the firm's internal quality-control procedures or review, or (c) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors.

21. Complaint Procedures. The Committee will oversee procedures for receiving, retaining and investigating the following:

- complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and

- confidential and anonymous submissions by employees concerning questionable accounting or auditing matters. In addition, the Committee will oversee procedures for receiving, retaining and investigating any "hotline" complaints or submissions delegated to the Committee by the Board.

22. Ethical Compliance. The Committee will review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure compliance with applicable laws and stock exchange listing requirements, including the Company's Code of Conduct and Ethics ("Code"). The Committee will consider any request by directors or executive officers of the Company for a waiver from the Code. Any approved waivers shall be promptly disclosed as required by applicable law and stock exchange listing requirements.

## **CORPORATE GOVERNANCE GUIDELINES**

46.     Sprinklr also maintains Corporate Governance Guidelines (the "Guidelines"),

which state that they are "designed to give directors a flexible framework for effectively pursuing

the Company's objectives for the benefit of its stockholders."

47.    In a section titled "Board Responsibilities," the Guidelines provide as follows:

A director should discharge his or her duties, including duties as a member of any committee on which he or she serves, in good faith and in a manner the director reasonably believes to be in the best interests of the Company and its stockholders. Board members will comply with the laws and requirements of the Exchange and other applicable regulatory agencies and with all policies and guidelines of the Company, including without limitation, the Company's Code of Conduct and Ethics.

Each director is expected to disclose promptly to the Board and respond promptly and accurately to periodic questionnaires or other inquiries from the Company regarding any existing or proposed relationships with the Company, including compensation and stock ownership, which could affect the independence of the director. Each director will also promptly inform the Board of any material change in such information, to the extent not already known by the Board.

Directors have an obligation to protect and keep confidential all of the Company's non-public information unless the Company has authorized public disclosure or unless otherwise required by applicable law. Confidential information includes all non-public information entrusted to or obtained by a director by reason of his or her position on the Board. This includes information regarding the Company's strategy, business, finances, and operations, and will include minutes, reports, and materials of the Board and committees, and other documents identified as confidential by the Company.

Directors may not use such confidential information for personal benefit or to benefit other persons or entities other than the Company. Unless authorized by the Company or applicable law, directors will refrain from disclosing confidential information to anyone outside the Company, especially anyone affiliated with any entity or person that employs the director or has sponsored the director's election to the Board. The confidentiality obligations described above continue even after service on the Board has ended. Any questions or concerns about potential disclosures should be directed to the Company's General Counsel, who then may communicate with the Chief Executive Officer or the Nominating Committee regarding the potential disclosures.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements
### Issued During the Relevant Period

48.    The Relevant Period begins on March 29, 2023, when the Company held an

earnings conference call to discuss the Company's financial results for the fourth quarter and full

fiscal year 2023 financial results. During the call, Defendant Thomas stated the following:

> In closing, I'd like for you to have three clear takeaways. Number one, we're going to be a disruptive player in CCaaS. That's a pretty 30, 40-year old industry. We are a digital native company who has created a modern omni-channel approach to integrating 30 plus digital channels that now includes voice, and we're challenging some of the well-known legacy players with an entirely different approach omni-channel and AI base for customer service. Number two, we will continue to innovate and win in social. It's where we started as a company, and that foundation has enabled us to build disruptive new opportunities like we are doing in CCaaS. And lastly, number three, we are well positioned to begin mainstreaming our solutions and AI for customer-facing functions. We have a five-year head-start, an advantage in building proprietary AI that's integrated into all products across our entire platform, a platform that's built on a highly open, scalable and flexible architecture.

49.    During the same call, Defendant Thomas was asked about the Company's diversion

of resources, specifically whether it was hiring specialists in CCaaS. Defendant Thomas responded

as follows:

> Yes. So I can confirm that it is a big focus for the company. In fact, internally, we say this is the year of our contact center business. I can confirm that this is something that was very intentional and we have been doing steadily for the last several quarters, I would say, for the last probably even 18 months. So we have been hiring people from traditional contact center companies. We have -- we're building out and have built out a team of dedicated specialists. So it's very important to have that domain knowledge and vocabulary in addition to the technology. So we have staffed everything from the product organization to the sales organization and support organization people who have been doing it, in some cases, for like 20-25 years, who are also equally elated to see a very modern approach to this whole space.

50.    On June 5, 2023, the Company held an earnings conference call to discuss the

Company's financial results for the first quarter of fiscal year 2024. During the Call, Defendant

Thomas made the following statement regarding the progress of the Company's CCaaS business:

> So, despite the macro environment, *we are very pleased with how we're managing, what's in our control with our go-to-market strategy, productivity and execution. Specifically, we're excited about the progress we're making to make it easier to sell, which has been a top priority for the company*. This past quarter, we made

several key hires in the service overlay team to add expertise and depth to our CCaaS offering go-to-market, and we continue to verticalize to enable quicker time-to-value and faster deployments. *We are now up and running for CCaaS, with a couple of more key industries, including financial services and airlines*.

\* \* \*

*I'd love to provide a brief update on Sprinklr Service and our continued momentum as a disruptor in the CCaaS space*. Our vision is to help customers transform the contact center from a voice-focused cost center to a more efficient and effective AI-powered omnichannel revenue center by unifying it with marketing and sales. *IT buyers find Sprinklr to be a great fit for their needs, as they consolidate point solutions in the contact center stack to a platform that's built on a single code base with a very extendable architecture*.

51.     During the same call, Defendant Thomas was asked about the Company's expectations for customer renewals, to which Defendant Thomas responded:

Okay. So, there are two questions there. The first one is what are we seeing in our larger deals in terms of renewal. I'll tell you, once you buy into the Sprinklr approach, we keep growing. And two-story now, we have customers, who call us first before they go put out an RFP or open it up to a point solution, hey, do you guys do it, because they've bought into, they've tuned the AI model, they've set up the governance, they've got the analytics. I'll give you an example of a very, very large, I'd say top five, probably top three tech company that expanded their marketing services with us. And the idea was there was an agency breach that happened and issue that resulted in ad spend that was not governed and approved. So, they just paused spending till everybody got on Sprinklr, so that they can be compliant, right? And so they can have governance and visibility and they can have a global editorial calendar. So, I can confirm to you and you know we had one customer that paid us over $15 million, and if you count the number of customers that are paying over $10 million, that's going up as well.

52.     On July 12, 2023, the Company hosted its annual Investor Day conference. During the conference, Defendant Sarin discussed the Company's CCaaS and Core Suite businesses, stating: "all product suites are growing at a very healthy rate. I bring this out because many a times investors are of the – have some concerns that is it the case that one product suite is making up for declining growth or tepid growth on another product suite and that isn't the case here."

53.     Also during the Investor Day conference, Defendant Sarin announced guidance for the 2027 Fiscal Year, stating that the Company expected, at a minimum, $1 billion in subscription

revenue:

> What we are comfortable doing is at this point setting $1 billion in subscription revenue as floor for FY 2027. Now, that would compute to roughly an approximate 16% CAGR between now and then. And just so that we are clear, FY 2027 is really calendar year 2026. That ends in January 2027. So it really is three years from now. So what is baked into these numbers?
>
> What we have taken into account is the current environment persists. I have no way of projecting is there going to be a recession? Is there not going to be a recession? There is any number of pundits you find on CNBC talking about what's going to happen next? I didn't feel it was the right forum for me to make one of those statements. So we feel, given what we know right now, if the current environment persists, we are comfortable setting $1 billion in subscription revenue as floor. Said differently, should the environment improve, should sales cycles become shorter; all of that would be upside to these numbers.
>
> Now you'll notice I am not specifically talking about professional services revenue here. And I think that goes back to the earlier point that I made, that we fully expect that professional services mix to morph quite considerably over the next few years. We believe it's going to become a lot more targeted, a lot of it driven by CCaaS delivery and managed services, but the quantum of it may not be very much different than where we are today. So I think if you look at the broader picture, it seems to be a much smaller proportion of overall revenues than where we are today. And it just felt like in terms of setting the stage, subscription revenue is what we need to be measured against and we are comfortable putting down $1 billion as the floor for subscriptions[.]

54.     During the Investor Day conference, Defendant Thomas reiterated the Company's commitment to providing consistent communication to customers, stating:

> But you learn that we obsess about customers. I did 300 meetings last year, and every customer meet, I give them my cell phone number, and I say, call me if you're ever, ever upset. If you think we bullshitted you, call me. If you want to buy, our team will take care of it. My CTO flies over. We have AKA one of my engineers should be here. We've own him with a one way ticket to one of our customers early on and we told him, don't come back until the customer is happy. If you know other enterprise software companies that do that, buy their stock, right, but they learn it.
>
> * * *
>
> And for us, customer obsession starts when, after the sale, right. Checking in, making sure they get value. They're consuming the software. And we have a price. We don't do NPS. The reason we don't do NPS is we don't want to know whether you would recommend this. We ask you every customer, every quarter, every

month, depending on the size of the customer, we ask them, how happy are you at Sprinklr, that's it.

If you give us a 10. It means you're so happy that you're telling your kids about Sprinklr and they go mommy I don't know why you bother me with this stuff. And zero means you red us and we didn't know it. And if you don't give us a 10, we ask you, what are the three things we can x? Three things we get to prioritize, go to a product development process every week regionally it gets escalated. Early days at Sprinklr, I would say there's only one meeting you cannot miss in Sprinklr, it's called CDAP. Well, you could miss if you're attending your funeral you can miss the meeting, otherwise you're on. If your customer is unhappy, you're on. I'm not, I don't get upset at most things, most of you know that, I only curse out of excitement. But if a customer is unhappy and you're not jumping up and down to x it, I will get upset. That's baked into Sprinklr.

55.     On September 6, 2023, the Company held an earnings conference call to discuss the Company's financial results for the second quarter of fiscal year 2024. During the call, Defendant Sarin responded to a question regarding the Company's renewals for its Core Suite business, stating:

> Yes. And I -- I think, we did call out the fact that, look, our growth in RPO is because several large customers renew on a multi-year basis. But those are the ones you'd remember from even a few years ago, we had them do multi- year billings. So that hasn't happened this time, where we are sticking to annual billings. When I called out on the billing side that there were select customers that renewed early, that was only to make sure that, as you think about your Q3 billings, you do take that into account. But I think macro, if you just step back, we're seeing strength in renewal activity, as shown in the multi-year RPO renewals, RPO numbers, as well as our sense around overall billings for the year.

56.     During the same call, Defendants Thomas and Sarin were asked about the consistency of the Company's Core Suites renewal rates, as well as "large deal potential in the second half [of fiscal year 2024]." In response, Defendants Thomas and Sarin replied as follows, in relevant part:

> Thomas: Look, the macroenvironment is just about as uncertain as it was, and it has been. So we -- we're not seeing any different behavior this quarter or last quarter than we saw before. Budgets are tight, there's more CFO scrutiny and all the good things that come with people being not very sure where the market's going, right, and interest rates are going to be. But I think what you're seeing is, like a consistent

trickling impact of our better execution and focus on go-to-market.

***

Sarin: We -- as I look at the quantum of business that we are booking, it sort of seems in-line with what we would expect. It's -- like any enterprise software company, we're pretty back-end loaded, so I wouldn't make any broad assumptions around how Q3 and Q4 would land. But there is nothing that we are seeing today that would give us any cause for concern. It's sort of along the lines of what we would expect. So -- so steady is what I would say.

57.    The next day, September 7, 2023, Defendant Sarin represented the Company at the Citi Global Technology Conference. During the conference, Defendant Sarin was asked about the Company selling the Core Suite and Sprinklr Service. In response, Defendant Sarin stated:

Yeah, I think that's a fantastic question because we were acutely aware that the buyer for our traditional set of products, our core products, was somebody in the marketing team. And as we are outselling CCaaS, in some companies, social care is still with marketing. So that's an easier sell. When you're obviously trying to do a full stack replacement, that is sitting with the CIU as an example. So, what we have done is two things. One is there is a specialist overlay team today, so that we started hiring, I'd say, about 9, 12 months ago. And they've come from your big CCaaS vendors. They sort of know the lingo. They know how to go about selling the product. They know where the bodies are buried. So, they've been a tremendous addition to the sales team. And so, we have aligned them by, what we call, sort of divisional leaders. So, in the US, there'll be, several of them, same in EMEA same in APJ. And the idea there is they worked hand in glove with the individual reps in the territories to unearth new CCaaS opportunities. So, that's something that's working really well.

58.    During the same call, Defendant Sarin was asked about the tradeoff between growth and margins and about "some of the efficiencies that [Defendant Sarin was] able to unlock at the Company." In response, Defendant Sarin stated:

Yeah, I think that's a fantastic question, because one of the things we've been very clear in saying is maybe in the past, investments in the company were not entirely thought through the lens of what is unit economics or is productivity per rep improving. And I think we're now just applying a little bit more careful analysis, if you will, before we make any more investments, right? So, I don't think one should view it in the lens of is this a cost versus growth trade off because we believe we have enough investments in place that should allow us to grow at the rate that we are growing. So, where are we getting all these efficiencies from? Even things like when I said technology, solution brokers for CCaaS, that obviously means I don't

22

need that many direct reps selling CCaaS because I have partners doing it for me, right?

59.    The above statements were materially false and/or misleading. Specifically, the Individual Defendants made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) the Company's diversion of resources from its Core Suite, an established source of growth, to its new business venture with CCaaS produced artificially inflated growth in the short-term; (2) as such, the Core Suite business was negatively impacted; (3) the Company did not have sufficient financial forecasting capabilities; (4) as a result, the Company's growth projections did not account for issues involved in scaling a new product; (5) the Company minimized the true impact of changing macroeconomic conditions on the business; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH EMERGES**

60.    On December 6, 2023, the Company held an earnings conference call to discuss the Company's financial results for the third quarter of fiscal year 2024. During the call, Defendant Thomas stated the following, in relevant part:

> The investments we've been making over the last 18 months are enabling us to Mainstream our product suites into large replacement markets starting with establishing ourselves as a disruptor in CCaaS. As we've diversified the business and focused on scaling our CCaaS business, I would like to acknowledge that they've made slower progress on some of our other go-to-market initiatives focused on our core product suites.

61.    During the same call, Defendant Sarin discussed proper scaling of the Sprinklr service, stating:

> Our primary strategic focus in FY '24 has been to rapidly scale our Sprinklr service product suite. We are very pleased with the results, having made significant

23

demonstrable progress with Sprinklr service, gaining market share and customer momentum in the CCaaS market.

As Ragy mentioned, our focus on succeeding in our CCaaS business slowed progress with some of our other go-to-market initiatives in our core product suites, much more than we had anticipated.

62.     During the call, Defendant Thomas was asked about headwinds facing the Company and whether those headwinds were observed earlier in fiscal year 2024 as well as the third quarter. In response, Defendant Thomas stated:

It's kind of consistent, right? But because as Manish said, we have a much bigger base coming up in Q4. So we're not seeing the macro environment get better or get worse. And so I wouldn't characterize it something changed in Q4.

* * *

But I would, again, to reconcile the two, right, the macro, we don't think is what's changing. It's really our over-rotation that's causing the change that, where Manish has articulated.

63.     Defendant Sarin also acknowledged the negative effect the "over-rotation" had on the Company, stating:

At this time, based on what I just outlined, coupled with an unforgiving macro environment, we expect a sequential quarterly increase of 2.5% for each quarter of FY '25. This equates to approximately a 10% total revenue growth for the full year, which we believe is the appropriate starting point for FY '25.

64.     On the same call, Defendant Thomas was asked about the Company's preparations for its "go-to market revamp," including incremental hiring and internal resource allocations. In response, Defendant Thomas stated:

It's more of an internal resource allocation. In hindsight, I think the most obvious explanation for this is the fact that we, and I don't know whether we would have, knowing everything we know, done it differently. We kind of over-rotated a little bit more on the CCaaS side. And so we took our field and we incented them strongly to go sell CCaaS. And essentially there's a lot of people who jumped in and really are happy and we're thrilled with the results.

And there are some that jumped but didn't quite -- jump -- didn't quiet [sic], make

24

it on the other side. And the the [sic] fix is quite obvious to all of us. You've got to take the field folks in sales and support and service that came from the social suite background or the marketing suite background or the research inside suite background, and we got to let them go back and focus on it.

So what we are doing now, as we think and plan for the next year is we are adjusting quotas and we are just bifurcating or trifurcating the field to just -- so you can fix the over-rotation. We did, and we're pretty hopeful that in one or two quarters, we'll begin to see some data that would allow us to just update you further.

65.     On the same call, Defendant Sarin was asked whether the $1 billion guidance from the Investor Day had changed at all. In response, Defendant Sarin stated:

It does not change our FY '27 long-term plan. And again, just to be clear, this is not our guide for '25. I will do that in our March earnings call. Just given the some of the renewal pressures we are seeing here in Q3. And as I said Q4, we expect it to be, you know, quite intense. Given the visibility that we have, and we just wanted to be clear that we laid out what we are seeing right now, it might change substantially when we talk in March, and we talk about the full year guide. But sitting where we sit today, we don't feel any difference about FY '27 than we did six months ago.

66.     On this news, the price of the Company's common stock fell approximately 33%, from a closing price of $16.70 per share on December 6, 2023 to a closing price of $11.11 per share on December 7, 2023.

67.     On March 27, 2024, the Company issued a press release announcing the Company's financial results for the fourth quarter and full fiscal year 2024. The press release provided the following information, in relevant part:

Sprinklr is providing the following guidance for the full fiscal year ending January 31, 2025:

- Subscription revenue between $740.5 million and $741.5 million.
- Total revenue between $804.5 million and $805.5 million.
- Non-GAAP operating income between $104 million and $105 million.
- Non-GAAP net income per share between $0.38 and $0.39, assuming 291 million diluted weighted-average shares outstanding.

68.     That same day, the Company held an earnings conference call to discuss the

Company's fourth quarter and full year of the 2024 Fiscal Year financial results. During the call, Defendant Thomas was asked about "renewals pressure" and whether the Company anticipated that customer renewals improving:

> So I think, first off, I got to tell you, we put a lot of energy behind understanding what is going on. And what I can confirm, as we've done in the past, is we think the majority of it is self-inflicted. And what we're finding that is that the best execution of our team versus the best execution of any competitor in our core markets and the CCaaS frankly we win. So what we're finding is -- and I say it's self-inflicted because weak execution on our side, meeting strong execution of the competitor is when we are losing. And so it gives us a lot of confidence that these are fixable things and it's a part of this big set of initiatives that we have outlined. And like we said, it's going to take a few quarters, but right now we're pretty optimistic that we should see a retention go back to our historic norms once our execution and what we can control is addressed.

69.    On June 5, 2024, the truth fully emerged when the Company issued a press release revealing that the Company was revising its guidance for the second quarter and full fiscal year 2025, proving the following information, in relevant part:

> Sprinklr is providing the following guidance for the full fiscal year ending January 31, 2025:
>
> - Subscription revenue between $714 million and $716 million.
> - Total revenue between $779 million and $781 million.
> - Non-GAAP operating income between $104 million and $105 million.
> - Non-GAAP net income per share between $0.40 and $0.41, assuming 276 million diluted weighted-average shares outstanding.

70.    That same day, the Company held an earnings conference call to discuss the Company's earlier issued revised guidance and provide a second quarter update. During the call, Defendant Thomas stated the following, in relevant part:

> This quarter, we made good progress with these leadership changes and operational improvement. However, these changes are significant and will take time to show measurable improvements. Furthermore, implementing these changes during what has become a more challenging macro environment has created more short- term volatility than we expected. In the first quarter, buying behavior was more measured, sales cycles were longer, and budget scrutiny on renewals increased as well. As a result, Q1 performance reflects lower net new bookings and increased

customer churn. Based on the current outlook for the year, we are lowering our revenue guidance for FY '25, but are committed to diligently managing the business and maintaining our non-GAAP operating income guidance. Manish will provide more details in his remarks.

* * *

Look, there are three things that are super clear to us. One is, as we said, the macro is we're experiencing a pronounced change. Second, our go-to-market motion and the transition to the level of maturity that we need to have for a business of this scale and size, we are not there and it's taking us longer. And I'm not going to go through all of it. I'm sure we can follow up in the actions. But with the kind of people that we have around us and inside the company, what [we] needed to do was fairly clear. And what we realized as we went late last year and looked at our own progress, needless to say, no one, including myself, was happy with the pace of progress. And what we decided to do was to upgrade and make significant upgrades to the leadership, starting at the very top, right? That's what the investors and the Board would love to see.

* * *

I'll acknowledge that we're seeing increased pressure on the core, which is everything outside of CCaaS the way we see it. And what we're finding is more price compression. We're not seeing like a crazy amount of logo churn. We're not seeing, I'm sure there'll be a question, we're not seeing the competitive dynamics shift. What we're finding is CIOs and CMOs looking at their top spend and looking to find money. And we're a premium provider. We were able to command premium prices. And we're just getting squeezed. And that I see as the primary driver. And a lot of these as, Arjun, I'm making more calls than you would ever expect someone like me to be doing to these customers. And I can tell you firsthand, a lot of it is our own execution . . . .

71.    During the same call, Defendant Sarin revealed that the Company "continue[d] to experience higher churn in our core product suites, driven by reduced marketing spend, elimination of programs, and seat reductions," and that the high churn would likely continue throughout fiscal year 2025.

72.    On this news, the price of the Company's common stock fell approximately 15%, from a closing price of $10.84 per share on June 5, 2024 to a closing price of $9.20 per share on June 6, 2024.

27

**<u>FALSE AND MISLEADING PROXY STATEMENTS ISSUED DURING THE RELEVANT PERIOD</u>**

73.    On May 5, 2023, the Company filed a proxy statement on Schedule 14A with the SEC (the "2023 Proxy Statement"). The 2023 Proxy Statement was solicited by Defendants Agrawal, Gillis, Kanouff, Chambers, Schloss, Wasim, Thomas, and Haverty and called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Agrawal, Gillis, and Kanouff to the Board; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2024 fiscal year; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

74.    Regarding the "Role of the Board of Directors in Risk Oversight," the 2023 Proxy Statement stated the following, in relevant part:

> One of the key functions of our board of directors is informed oversight of our risk management process. Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through the board of directors as a whole, as well as through various standing committees of the board of directors that address risks inherent in their respective areas of oversight. In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for our company. The involvement of our full board of directors in reviewing our business is an integral aspect of its assessment of management's tolerance for risk and also its determination of what constitutes an appropriate level of risk.
>
> While our full board of directors has overall responsibility for risk oversight, it has delegated oversight of certain risks to its committees. Our audit committee monitors our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. Furthermore, our audit committee oversees risks associated with information security, and regularly reviews with management our information security programs and assessment, management and mitigation of such risk. Further, our audit committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. Our compensation committee monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. Our nominating and corporate governance committee oversees our major corporate governance risks, including

through monitoring the effectiveness of our corporate governance guidelines.

At periodic meetings of our board of directors and its committees, management reports to and seeks guidance from our board and its committees with respect to the most significant risks that could affect our business, such as legal risks, information security and privacy risks, and financial, tax and audit-related risks. In addition, among other matters, management provides to our audit committee periodic reports on our compliance programs and investment policy and practices.

75.     Regarding the Code, the 2023 Proxy Statement stated the following, in relevant part:

Our board of directors has adopted the Sprinklr, Inc. Code of Conduct and Ethics that applies to all officers, directors and employees. The Code of Conduct and Ethics is available on our website at investors.sprinklr.com. If we make any substantive amendments to the Code of Conduct and Ethics or grant any waiver from a provision of the Code of Conduct and Ethics to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website rather than by filing a Current Report on Form 8-K.

76.     Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Agrawal, Gillis, and Kanouff to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve named executive officer compensation on an advisory, non-binding basis.

77.     On May 3, 2024, the Company filed the 2024 Proxy Statement. The 2024 Proxy Statement was solicited by Defendants Pham, Agrawal, Gillis, Kanouff, Schloss, Wasim, Thomas, and Haverty and asked that the Company's shareholders vote to, *inter alia*: (1) re-elect Defendants Pham, Schloss, and Wasim to the Board; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2025 Fiscal Year; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

78.     Regarding the "Role of the Board of Directors in Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

29

One of the key functions of our board of directors is informed oversight of our risk management process. Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through the board of directors as a whole, as well as through various standing committees of the board of directors that address risks inherent in their respective areas of oversight. In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for our company. The involvement of our full board of directors in reviewing our business is an integral aspect of its assessment of management's tolerance for risk and also its determination of what constitutes an appropriate level of risk.

While our full board of directors has overall responsibility for risk oversight, it has delegated oversight of certain risks to its committees. Our audit committee monitors our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. Furthermore, our audit committee oversees risks associated with information security, and regularly reviews with management our information security programs and assessment, management and mitigation of such risk. Further, our audit committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. Our compensation committee monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. Our nominating and corporate governance committee oversees our major corporate governance risks, including through monitoring the effectiveness of our corporate governance guidelines.

At periodic meetings of our board of directors and its committees, management reports to and seeks guidance from our board and its committees with respect to the most significant risks that could affect our business, such as legal risks, information security and privacy risks, and financial, tax and audit-related risks. In addition, among other matters, management provides to our audit committee periodic reports on our compliance programs and investment policy and practices.

79.    Regarding the Code of Conduct, the 2024 Proxy Statement stated the following, in relevant part:

Our board of directors has adopted the Sprinklr, Inc. Code of Conduct and Ethics that applies to all officers, directors and employees. The Code of Conduct and Ethics is available on our website at investors.sprinklr.com. If we make any substantive amendments to the Code of Conduct and Ethics or grant any waiver from a provision of the Code of Conduct and Ethics to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website rather than by filing a Current Report on Form 8-K.

30

80.    Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Pham, Schloss, and Wasim to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve named executive officer compensation on an advisory, non- binding basis.

81.    The 2023 and 2024 Proxy Statements failed to disclose that: (1) the Company's shift from established sources of growth to emphatically prioritize scaling a new business venture with CCaaS produced artificially inflated growth in the short-term; (2) as such, the Company's already-established sources of revenue were negatively impacted; (3) the Company did not have sufficient financial forecasting capabilities; (4) as a result of this, the Company's growth projections did not consider the problems involved in scaling a new product; (5) the Company minimized the true impact of changing macroeconomic conditions had on the business; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

82.    In addition, the 2023 and 2024 Proxy Statements were materially false and misleading because, despite statement to the contrary, the Individual Defendants failed to abide by the Code by: (i) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (ii) failing to report violations of the Code. In addition, The 2023 and 2024 Proxy Statements were materially false and misleading because, despite statements to the contrary, the Board had not adequately performed its risk oversight functions.

### THE INDIVIDUAL DEFENDANTS CAUSED SPRINKLR TO REPURCHASE THE COMPANY'S COMMON STOCK AT ARTIFICIALLY INFLATED PRICES

83.    During the Relevant Period, Sprinklr repurchased its own shares at artificially inflated prices, causing substantial damage to the Company. In total, the Company expended over $170,000 repurchasing 14,031 shares of its own common stock at prices that did not reflect the actual value of the stock. As a result, Sprinklr overpaid for repurchases during the relevant period by approximately $41,612.56.

84.    On March 29, 2024, Sprinklr filed an annual report on Form 10-K with the SEC. According to that annual report, between January 1, 2024 and January 31, 2024, the Company repurchased 2,400 shares of its own common stock for a total approximate cost of $29,544, or an average price of $12.31. Given that the Company's stock was actually worth only $9.20 per share,[1] Sprinklr overpaid for those repurchases by approximately $7,464.

85.    On June 5, 2024, Sprinklr filed a quarterly report on Form 10-Q with the SEC. According to that quarterly report, the Company made the following repurchases of its own common stock: (i) between February 1, 2024 and February 29, 2024, the Company repurchased 1,920 shares for a total approximate cost of $24,345.60, or an average price of $12.68; (ii) between March 1, 2024 and March 31, 2024, the Company repurchased 909 shares for a total approximate cost of $11,617.02, or an average price of $12.78; and (iii) between April 1, 2024 and April 30, 2024, the Company repurchased 5,512 shares for a total approximate cost of $65,151.85, or an average price of $11.82. Given that the Company's stock was actually worth $9.20 per share, Sprinklr overpaid for those repurchases by approximately $24,377.26.

86.    On September 9, 2024, Sprinklr filed a quarterly report on Form 10-Q with the SEC. According to that quarterly report, between May 1, 2024 and May 31, 2024, the Company repurchased 3,290 shares of its own common stock for a total approximate cost of $40,039.30, or

---

[1] The price at the close of trading on June 6, 2024, when the truth fully emerged.

an average price of $12.17. Given that the Company's stock was actually worth $9.20 per share, Sprinklr overpaid for those repurchases by approximately $9,771.30.

## DAMAGES TO SPRINKLR

87.    As a direct and proximate result of the Individual Defendants' misconduct, Sprinklr has expended and will continue to expend many millions of dollars.

88.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

89.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

90.    As a direct and proximate result of the Individual Defendants' conduct, Sprinklr has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

91.    Plaintiff brings this action derivatively in the right and for the benefit of Sprinklr to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties as directors and/or officers of Sprinklr.

92.    Sprinklr is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

93.    Plaintiff will adequately and fairly represent the interests of Sprinklr and its

33

stockholders in enforcing and prosecuting its rights.

94.     Plaintiff is a current shareholder of Sprinklr and has been a continuous shareholder of the Company's common shares at all relevant times.

95.     A pre-suit demand on the Board is futile and, therefore, excused. At the time this action was commenced, the Board was comprised of the following ten individuals: Defendants Thomas, Agrawal, Gillis, Haverty, Kanouff, Schloss, and Wasim Defendants (the "Director Defendants"), as well as Non-Parties Hauser, Read, and Ward. Accordingly, Plaintiff is only required to show that six directors of the current Board cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

96.     Additional reasons that demand on Defendant Thomas is futile follow. Defendant Thomas served as the Company's CEO from September 2009 until November 2024 and has served as Chairman of the Board since September 2009. Defendant Thomas currently serves as Advisor to the CEO. As the Company admits in the 2024 Proxy Statement, Defendant Thomas is a non-independent director. The Company provides Defendant Thomas with significant compensation as detailed above. Defendant Thomas solicited the 2023 and 2024 Proxy Statements, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Thomas breached

34

his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused. In addition, Defendant Thomas was named as a defendant in the Securities Class Action.

97.    Additional reasons that demand on Defendant Agrawal is futile follow. Defendant Agrawal has served as a Company director since August 2011.  The Company provides Defendant Agrawal with significant compensation as detailed above. Defendant Agrawal solicited the 2023 and 2024 Proxy Statements, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Agrawal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

98.    Additional reasons that demand on Defendant Gillis is futile follow. Defendant Gillis has served as a Company director since November 2015.  The Company provides Defendant Gillis with significant compensation as detailed above. Defendant Gillis solicited the 2023 and 2024 Proxy Statements, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gillis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

99.     Additional reasons that demand on Defendant Haverty is futile follow. Defendant Haverty has served as a Company director since December 2022.  The Company provides Defendant Haverty with significant compensation as detailed above. Defendant Haverty solicited the 2023 and 2024 Proxy Statements, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Haverty breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

100.     Additional reasons that demand on Defendant Kanouff is futile follow. Defendant Kanouff has served as a Company director since August 2018.  The Company provides Defendant Kanouff with significant compensation as detailed above. Defendant Kanouff solicited the 2023 and 2024 Proxy Statements, both of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor controls over reporting, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Kanouff breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

101.     Additional reasons that demand on Defendant Schloss is futile follow. Defendant Schloss has served as a Company director since January 2022.  The Company provides Defendant Schloss with significant compensation as detailed above. Defendant Schloss solicited the 2023 and

2024 Proxy Statements, both of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor controls over reporting, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Schloss breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

102.    Additional reasons that demand on Defendant Wasim is futile follow. Defendant Wasim has served as a Company director since October 2020.  Defendant Wasim solicited the 2023 and 2024 Proxy Statements, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Wasim breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103.    Additional reasons that demand on Read is futile follow. Read is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its President and CEO) is an employee of the Company who derives substantially all of his income from his employment with Sprinklr, rendering him not independent. As CEO, Read fails the NYSE's bright-line independence test and cannot, therefore, be considered independent. As such, Read could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Read is therefore futile.

104.    Additional reasons that demand on Hauser is futile follow. Hauser has served as a member of the Board since January 2025. The Company provides Hauser with significant compensation as detailed above. As such, Hauser cannot independently or impartially consider any demand adverse to the Director Defendants serving on the Compensation Committee who determine Hauser's compensation. Hauser therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Hauser is thus futile.

105.    Additional reasons that demand on Ward is futile follow. Ward has served as a member of the Board since January 2025. The Company provides Ward with significant compensation as detailed above. As such, Ward cannot independently or impartially consider any demand adverse to the Director Defendants serving on the Compensation Committee who determine Ward's compensation. Ward therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Ward is thus futile.

106.    Additional reasons that demand upon the Board is futile follow.

107.    Defendants Agrawal, Gillis, and Wasim serve as members of the Audit Committee and/or served as members of the Audit Committee during the Relevant Period and, pursuant to the Audit Committee Charter, were specifically charged with, *inter alia*, the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Agrawal, Gillis, and Wasim cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would

expose them to substantial liability and threaten their livelihood.

108. The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

109. As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.

110. Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Director Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Sprinklr stock and stock options they held.

111. The Director Defendants, as members of the Board, were and are subject to the Company's Code. The Code goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Sprinklr's standards of business conduct. The Director Defendants violated the Code because they knowingly

or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

112. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

113. The acts complained of herein constitute violations of fiduciary duties owed by Sprinklr's officers and directors, and these acts are incapable of ratification.

114. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Sprinklr. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Sprinklr, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be

expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

115.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Sprinklr to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

116.    Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## FIRST CLAIM

### Against the Individual Defendants for Violations of
### Section 10(b) of the Exchange Act and Rule 10b-5

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

119.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

41

120. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Sprinklr not misleading.

121. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Sprinklr.

122. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were directly responsible for the false and misleading statements and omissions disseminated to the public through press releases and filings with the SEC.

123. The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Sprinklr, their control over, and/or receipt and/or modification of Sprinklr's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Sprinklr, participated in the fraudulent scheme alleged herein.

124. As a result of the foregoing, the market price of Sprinklr common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements,

Plaintiff, relied on the statements described above and/or the integrity of the market price of Sprinklr common stock in purchasing Sprinklr common stock at prices that were artificially inflated as a result of these false and misleading statements and was damaged thereby.

125.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

126.    Plaintiff, on behalf of Sprinklr, has no adequate remedy at law.

## SECOND CLAIM

### Against Defendants Thomas and Sarin for Contribution Under Sections 10(b) and 21D of the Exchange Act

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    The conduct of Defendants Thomas and Sarin as described herein has exposed the Company to significant liability under various federal securities laws by their misconduct.

129.    Sprinklr, Thomas and Sarin are named as defendants in the Securities Class Action that alleges and asserts claims arising under the federal securities laws. Sprinklr is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

130.    If Sprinklr is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendants Thomas and Sarin as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. Sprinklr is entitled to contribution and indemnification from Defendants Thomas and Sarin in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

131.    As officers and/or directors, Defendants Thomas and Sarin had the power or ability to, and did, control or influence, either directly or indirectly, Sprinklr's general affairs, including

43

the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

132.    Defendants Thomas and Sarin are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

133.    Defendants Thomas and Sarin have damaged the Company and are liable to the Company for contribution.

134.    As such, Sprinklr is entitled to receive all appropriate contribution or indemnification from Defendants Thomas and Sarin.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

135.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

136.    The Director Defendants solicited the 2023 and 2024 Proxy Statements containing materially false and misleading statements and/or omissions.

137.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

138.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a- 9.

139.    Under the direction and watch of the Director Defendants, the 2023 and 2024 Proxy Statements failed to disclose that: (i) the Individual Defendants made and/or caused the Company to make the false and misleading statements and omissions alleged herein; and (ii) the Board failed to adequately carry out its risk management and oversight obligations and failed to adhere to the Code.

140.    The 2023 and 2024 Proxy Statement also failed to disclose that: (1) the Company's diversion of resources from its Core Suite, an established source of growth, to its new business venture with CCaaS produced artificially inflated growth in the short-term; (2) as such, the Core Suite business was negatively impacted; (3) the Company did not have sufficient financial forecasting capabilities; (4) as a result, the Company's growth projections did not account for issues involved in scaling a new product; (5) the Company minimized the true impact of changing macroeconomic conditions on the business; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

141.    In exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 and 2024 Proxy Statements were materially false and misleading. The misrepresentations

and omissions were material to Plaintiff in voting on matters set forth for shareholder determination.

142.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2023 and 2024 Proxy Statements.

143.    Plaintiff on behalf of Sprinklr has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duty

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

146.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

147.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

148. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

149. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## SIXTH CLAIM

### Against the Individual Defendants for Unjust Enrichment

150. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Sprinklr.

152. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Sprinklr that was tied to the performance or artificially inflated valuation of Sprinklr, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

153. Plaintiff, as a shareholder and a representative of Sprinklr, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and

breach of their fiduciary and contractual duties.

154.   Plaintiff on behalf of Sprinklr has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

155.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

156.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

157.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (a) paying and colleting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

158.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

159.   Plaintiff on behalf Sprinklr has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.   Directing all Individual Defendants to account for all damages caused by them

48

and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: March 26, 2025                                   Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*

## VERIFICATION

I, Ray Figurella, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

Dated: 3/23/2025

Signed by:

*Ray Figurella*

E1463BFC442D42A...

Ray Figurella